IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Newport News Division

FILED
IN OPEN COURT

JAN - 6 2010

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | CRIMINAL NO. 4:09 cr 93 |
| | ) | |
| JOSEPH VICK, JR., | ) | |
| | ) | |
| Defendant. | ) | |

## STATEMENT OF FACTS

This statement of facts is submitted in support of the defendant's plea of guilty to a criminal information charging conspiracy to distribute 100 grams or more of heroin, in violation of Title 21, United States Code, Sections 846 and 841(a)(1) and (b)(1)(B)(i). The parties stipulate and agree that had the matter gone to trial the United States would have proven the following facts beyond a reasonable doubt.

1.  Through cooperating witnesses, controlled purchases of narcotics, physical surveillance and electronic surveillance, it was determined that Darryl Wright was the overall leader and organizer of a drug trafficking conspiracy operating on the Virginia Peninsula, referred to herein as the WRIGHT DTO, which obtained heroin from sources of supply in the New York and New Jersey area. Members of the WRIGHT DTO stored the heroin at various locations known as "Table Tops" in the cities of Hampton and Newport News. Darryl Wright, together with other supervisors in the conspiracy, cut the heroin to dilute the purity of the heroin and then packaged the heroin into glassine bags for distribution by distributors working for the WRIGHT DTO. Distributors for the

WRIGHT DTO sold heroin to customers in the cities of Newport News, Hampton, Poquoson, Williamsburg, and the counties of York, James City, Gloucester, Middlesex and Mathews.

2. Members of the WRIGHT DTO distributed heroin in glassine bags that were sold to heroin users for either $10 or $20 a bag. Each bag that was packaged by the WRIGHT DTO contained from .032 to .046 gram of heroin. Mid-level distributors typically obtained a "bundle" (10 bags of heroin) from managers of the WRIGHT DTO at a reduced price of $60.00 per "bundle." Certain mid-level distributors obtained uncut heroin from managers of the WRIGHT DTO, which they then cut and packaged themselves in a manner that was consistent with the WRIGHT DTO. Many of the street-level heroin dealers were also heroin users, distributing heroin to support their habit. These heroin street-level dealers and customers either purchased the heroin in one of the many "open-air" markets or "hot spots" in the Southeast Community of Newport News or met their mid-level dealers at pre-arranged locations, such as a convenience store, gas station, restaurant, or hotel. The arrangements for the amount and cost of the heroin, as well as the location to meet were often made through telephonic contact. Typically, the heroin street-level dealers and customers obtained heroin on a daily basis, sometime twice a day, from their mid-level distributors. Because of this demand, the mid-level heroin distributors were re-supplied by the managers of the WRIGHT DTO on a frequent basis.

3. In or about late 2007, JOSEPH VICK, JR. met Darryl Wright, a/k/a "Mike" at the residence of Edward Hill, a/k/a "Sonny." Thereafter, JOSEPH VICK, JR. began to obtain bundles of heroin from the WRIGHT DTO for distribution by himself and Tonnette Williams. Typically JOSEPH VICK, JR. would call Darryl Wright for VICK and Williams to obtain heroin. Darryl Wright would give them permission to meet with Obadiah Bennett, a/k/a "O" in order to obtain

heroin. JOSEPH VICK, JR., accompanied by Tonnette Williams would meet with Obadiah Bennett, typically once or twice per day at the McDonalds or Shell Gas Station in the Michaels Woods section of Hampton, to obtain "bundles" of heroin. If Obadiah Bennett was unavailable, JOSEPH VICK, JR. and Williams would meet with Edward Myricks, a/k/a "Kaleef," typically near the AMC Movie Theatre in the Michaels Woods area of Hampton or in the 700 or 800 block of 23rd Street in Newport News, to obtain "bundles" of heroin. JOSEPH VICK, JR. and Tonnette Williams would obtain from 10 to 25 "bundles" of heroin, typically twice per day, from Obadiah Bennett or Edward Myricks for $60.00 per "bundle." Generally JOSEPH VICK, JR. and Williams only obtained 10 "bundles" at a time. JOSEPH VICK, JR. and Williams then sold the heroin to street-level dealers and customers that were heroin users for $10.00 per bag or $100.00 per "bundle."

4. During the period of the conspiracy when Tonnette Williams was working, JOSEPH VICK, JR. would meet with Obadiah Bennett or others in the morning to obtain "bundles" of heroin without Williams. However, Tonnette Williams was present in the afternoons with JOSEPH VICK, JR. to obtain heroin from managers of the WRIGHT DTO. In mid-summer 2009, JOSEPH VICK, JR. and Williams became indebted to the WRIGHT DTO and were unable to pay their debt. This indebtedness was due in part to the use of heroin by JOSEPH VICK, JR. For this reason, Darryl Wright and the managers of the WRIGHT DTO discontinued supplying "bundles" of heroin to JOSEPH VICK, JR. and Tonnette Williams.

5. On December 2, 2008, JOSEPH VICK, JR. agreed to distribute heroin to a cooperating witness. VICK directed the cooperating witness, who was acting under the direction and control of a Newport News detective, to his residence at 921 41st Street, Newport News, VA. When the witness arrived, JOSEPH VICK, JR. distributed a "bundle" (10 bags) of heroin to the witness for

$200. The cooperating witness brought the heroin directly back to the controlling detective. This controlled purchase was monitored and recorded using audio and video surveillance. On April 30, 2009, a qualified forensic chemist determined that the substance was heroin, a Schedule I narcotic controlled substance.

6. On December 11, 2008, a cooperating witness went directly to the residence at 921 41st Street, Newport News, VA, which was shared by VICK and Tonnette Williams. The cooperating witness met VICK and Williams outside and purchased a "bundle" (10 bags) of heroin for $200. The cooperating witness brought the heroin back to the controlling Newport News detective. This controlled purchase was monitored and recorded using audio and video surveillance. On April 30, 2009, a qualified forensic chemist determined that the substance distributed by JOSEPH VICK, Jr. and Tonette Williams was heroin, a Schedule I narcotic controlled substance.

7. On December 13, 2008, the cooperating witness went directly to VICK's residence at 921 41st Street, Newport News, VA, and met VICK outside. JOSEPH VICK, JR. distributed two "bundles" (20 bags) of heroin to the witness for $200. The cooperating witness brought the heroin directly back to the controlling Newport News detective. This controlled purchase was monitored and recorded using audio and video surveillance. On April 30, 2009, a qualified forensic chemist determined that the substance was heroin, a Schedule I narcotic controlled substance.

8. On January 3, 2009, a different cooperating witness, under the direction and control of detectives with the Newport News Police Department, went to area of JOSEPH VICK and Tonnette Williams' residence on 41st Street in an attempt to make a purchase of heroin. The cooperating witness met with VICK and Williams and purchased five bags of heroin for $100 from JOSEPH VICK, JR. in the presence of Williams. The cooperating witness brought the heroin back

to the controlling detective. This controlled purchase was monitored and recorded using audio and video surveillance. On May 5, 2009, a qualified forensic chemist determined that the substance purchased was heroin, a Schedule I narcotic controlled substance.

9. On January 21, 2009, at approximately 12:04 p.m., a cooperating witness spoke with VICK to make arrangements for the purchase of two bags of heroin. VICK said that he was at 20th Street and Jefferson Avenue. At approximately 12:19 p.m., the witness arrived at the Speedy Mart at 19th Street and Jefferson Avenue and purchased two bags of heroin for $40. The witness turned the heroin over to the controlling detective after the transaction. This controlled purchase was monitored and recorded using audio and video surveillance. On May 5, 2009, a qualified forensic chemist determined that of the substance distributed by VICK was heroin, a Schedule I narcotic controlled substance.

10. On May 4, 2009, another cooperating witness arrived at 42nd Street and Orcutt Avenue (near VICK and Williams' then residence) and JOSEPH VICK, JR. was observed by surveillance agents enter the vehicle operated by the witness. JOSEPH VICK, JR. told Williams where the heroin was located inside their residence. A few minutes later, Tonnette Williams returned to the vehicle operated by the witness and gave the heroin to VICK, who then counted the money from the cooperating witness, and distributed two "bundles" (20 bags of heroin) to the cooperating witness. The cooperating witness turned the heroin over to the controlling detective immediately after the transaction. This controlled purchase was monitored and recorded using audio and video surveillance. A qualified forensic chemist determined that the substance distributed by JOSEPH VICK, JR. and Williams was heroin, a Schedule I narcotic controlled substance.

11. On May 19, 2009, the Honorable Jerome B. Friedman, United States District Judge for the Eastern District of Virginia approved an application for an Order authorizing the interception of wire communications occurring to and from nTelos cellular/PCS telephone (757) 236-9675 being used by JOSEPH VICK, JR. and Tonnette Williams. Pursuant to the Court's Order of May 19, 2009, authorizing the interception of calls, monitoring commenced on May 20, 2009, at approximately 7:31 p.m. and the monitoring was terminated at 11:59 p.m. on June 18, 2009. During the 30-days of monitoring of VICK/Williams telephone, Joshua Autrey, Obadiah Bennett, Edward Hill, JOSEPH VICK, JR., Tonnette Williams, Darryl Wright, and over 80 other uncharged co-conspirators were intercepted discussing the distribution of heroin. In an effort to corroborate the intercepted telephone conversations on VICK/Williams telephone, members of the investigative team conducted physical surveillance of selected drug transactions and forwarded information to local and state law enforcement agencies for them to conduct "wall-off" stops. To that end, 15 persons associated with JOSEPH VICK, JR. and Tonnette Williams were arrested in possession of heroin in Newport News, Hampton, Gloucester County, and Mathews County, VA, during the 30-days of monitoring the VICK/Williams telephone. The wire interceptions confirmed that JOSEPH VICK, JR. and Tonnette Williams are mid-level distributors for the heroin WRIGHT DTO distributing heroin to dozens of heroin customers from the Virginia Peninsula and Middle Peninsula.

12. On December 9, 2009 JOSEPH VICK, JR. was arrested pursuant to a federal arrest warrant. FBI Agent R. Squizzero and TFA B. Price advised JOSEPH VICK, JR. of his *Miranda* rights. JOSEPH VICK, JR. indicated that he understood his rights and wanted to speak with the agents. JOSEPH VICK, JR. told the agents that sold heroin for the WRIGHT DTO. VICK stated that he got 10 "bundles" at a time and would re-up two times a day. VICK stated that he would pay

Wright $600.00 and would make $400.00 or less. VICK identified Obadiah Bennett, a/k/a "O" as the person that he usually met to obtain heroin and identified the locations that he met with Bennett to obtain the heroin. VICK stated that in the summer of 2009 he was cut-off by Wright because he owed Wright money. VICK identified other distributors that he knew were selling heroin for the WRIGHT DTO.

13. Between January 2008 and mid-summer 2009, JOSEPH VICK, JR. was personally involved in the distribution of approximately 1,560 grams of heroin (10 bundles per day, at least ten times per week, for at least 52 weeks). This drug quantity calculation is based on each bag of heroin distributed by the WRIGHT DTO containing approximately .03 grams of heroin.

14. The acts taken by the defendant, JOSEPH VICK, JR., in furtherance of the offense charged in this case, including the acts described above, were done willfully and knowingly with the specific intent to violate the law. The defendant acknowledges that the foregoing statement of facts does not describe all of the defendant's conduct relating to the offense charged in this case nor does it identify all of the persons with whom the defendant may have engaged in illegal activities. The defendant further acknowledges that he is obligated under his plea agreement to provide additional information about this case beyond that which is described in this statement of facts.

Respectfully submitted,

Neil H. MacBride
United States Attorney

By: *Laura P. Tayman*
Laura P. Tayman
Assistant United States Attorney

7

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, JOSEPH VICK, JR., and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
JOSEPH VICK, JR.

I am JOSEPH VICK, JR.'s attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
Jennifer T. Stanton
Counsel for JOSEPH VICK, JR.